**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

**VICTORIA ROEHRMAN**

**Plaintiff,**

vs.

**MCAFEE, LLC**

**Defendant.**

**Case No: 1:23-cv-2146-JMS-MG**

<u>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT**</u>

## TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ......................................................................................................ii

I.      Introduction ................................................................................................................1

II.     Personal Jurisdiction Against Defendant Is Properly Exercised Here ......................1

        A.      Background On McAfee's Marketing Strategies & Vendor Program ...........2

        B.      McAfee's Marketing Vendors Sent Text Messages To
                Plaintiff's Indiana Cell...................................................................................6

        C.      McAfee's Agents' Conduct Renders McAfee Subject To
                Specific Personal Jurisdiction.......................................................................7

                1.      Plaintiff's Implied Agency & Ratification Allegations...................8

                        a.      Implied Actual Authority......................................................9

                        b.      Ratification.........................................................................12

                2.      Alternatively, Jurisdictional Discovery Should Proceed...............13

III.    McAfee Misconstrues Plaintiff's TCPA § 227(b)(1)(A) Claim ...............................14

IV.     Plaintiff's Indiana DCSA Claim Is Well Plead........................................................17

V.      Conclusion.................................................................................................................20

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                                                                                 <u>PAGE(S)</u>

*ABN AMRO, Inc. v. Capital International, Ltd.,*
    595 F. Supp. 2d 805 (N.D. Ill. 2008) ................................................................................8

*Alterman v. Lydick,*
    241 F.2d 50 (7th Cir. 1957) ..........................................................................................12

*Aranda v. Caribbean Cruise Line, Inc.,*
    179 F. Supp. 3d 817 (N.D. Ill. 2016) ......................................................................12, 13

*Baker v. Caribbean Cruise Line, Inc.,*
    No. CV 13-8246-PCT-PGR, 2014 U.S. Dist. LEXIS 28960 (D. Ariz. Mar. 6, 2014) ..............7

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
    591 U.S. 610 (2020) ...............................................................................................16, 17

*Benson v. Fannie May Confections Brands, Inc.,*
    944 F.3d 639 (7th Cir. 2019) ........................................................................................18

*Bilek v. Federal Insurance Co.,*
    8 F.4th 581 (7th Cir. 2021) ...........................................................................................11

*Cacho v. McCarthy & Kelly LLP,*
    2024 WL 3293628 (S.D.N.Y. July 3, 2024) ..................................................................16

*Calder v. Jones,*
    465 U.S. 783 (1984) .......................................................................................................7

*Campbell-Ewald Co. v. Gomez,*
    577 U.S. 153 (2016) .....................................................................................................16

*Carr v. StillWaters Development Co., L.P.,*
    83 F. Supp. 2d 1269 (M.D. Ala. 1999) ....................................................................10, 11

*Cartrette v. Time Warner Cable, Inc.,*
    157 F. Supp. 3d 448 (E.D.N.C. 2016) ...........................................................................15

*Castagna v. Newmar Corp.,*
    2016 WL 3413770 (N.D. Ind. June 22, 2016) ...............................................................20

*Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.,*
    230 F.3d 934 (7th Cir. 2000) ........................................................................................14

*CFTC v. Gibraltar Monetary Corp.,*
    575 F.3d 1180 (11th Cir. 2009) ....................................................................................10

ii

*Elward v. Electrolux Home Prod., Inc.,*
264 F. Supp. 3d 877 (N.D. Ill. 2017) ...................................................................... 19

*Garvey v. Keller Williams Realty, Inc.,*
No. 2:23-cv-00920, 2024 U.S. Dist. LEXIS 80814 (D. Nev. May 2, 2024) ......................... 7, 8

*Gomez v. Campbell-Ewald Co.,*
768 F.3d 871 (9th Cir. 2014) .................................................................................. 8

*Hyatt International Corp. v. Coco,*
302 F.3d 707 (7th Cir. 2002) ................................................................................ 13

*In re DISH Network, LLC ,*
28 FCC Rcd 6574, 2013 FCC LEXIS 2057, 58 Comm. Reg. (P & F) (F.C.C. 2013) ............... 6

*In re* Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,
18 F.C.C. Rcd. 14014 (F.C.C. July 3, 2003) ............................................................ 16

*Jenkins v. National Grid USA,*
No. 15-CV-1219, 2017 U.S. Dist. LEXIS 49365 (E.D.N.Y. Mar. 31, 2017) ...................... 11

*Keim v. ADF MidAtlantic, LLC.,*
199 F. Supp. 3d 1362 (S.D. Fla. 2016) .................................................................... 7

*King v. Time Warner Cable,*
113 F. Supp. 3d 718 (S.D.N.Y. 2015) ..................................................................... 15

*Krakauer v. Dish Network, L.L.C.,*
925 F.3d 643 (4th Cir. 2019) .................................................................................. 1

*Loper Bright Enters. v. Raimondo,*
2024 WL 3208360 (U.S. June 28, 2024) .................................................................. 15

*Luna v. Shac, LLC,*
No. C14-00607, 2014 U.S. Dist. LEXIS 96847 (N.D. Cal. July 14, 2014) ......................... 7

*Lyman v. QuinStreet, Inc.,*
2024 WL 3406992 (N.D. Cal. July 12, 2024) ................................................. 15, 16, 17

*Marshall v. Grubhub Inc.,*
No. 19-CV-3718, 2021 WL 4401496 (N.D. Ill. Sept. 27, 2021) ................................... 15

*Moore v. Charter Communs., Inc.,*
523 F. Supp. 3d 1046 (N.D. Ill. 2020) ................................................................ 9, 10

*Northern Grain Marketing, LLC v. Greving,*
743 F.3d 487 (7th Cir. 2014) .................................................................................. 6

*Outzen v. Kapsch Trafficcom USA, Inc.,*
    2021 WL 914021 (S.D. Ind. Mar. 10, 2021) ........................................................ 18, 19

*Payton v. Kale Realty, LLC,*
    No. 13 C 8002, 2014 U.S. Dist. LEXIS 118590 (N.D. Ill. Aug. 26, 2014) ..............7

*Purdue Research Foundation v. Sanofi-Synthelabo, S.A.,*
    338 F.3d 773 (7th Cir. 2003) ....................................................................... 2, 6, 7

*Snap-On, Inc. v. Robert Bosch LLC,*
    No. 09 C 6914, 2012 U.S. Dist. LEXIS 174217 (N.D. Ill. Dec. 10, 2012) ...............14

*Spiegel v. Reynolds,*
    No. 15 C 8504, 2016 U.S. Dist. LEXIS 161642 (N.D. Ill. Nov. 22, 2016) .............14

*Tamburo v. Dworkin,*
    601 F.3d 693 (7th Cir. 2010) .....................................................................6, 7

*United States v. Dish Network L.L.C.,*
    954 F.3d 970 (7th Cir. 2020) .........................................................................1

*Vanzant v. Hill's Pet Nutrition, Inc.,*
    934 F.3d 730 (7th Cir. 2019) ........................................................................18

*Weekly v. Fifth Third Bank,*
    No. 20-CV-01786, 2020 WL 7626737 (N.D. Ill. Dec. 22 2020) ...............................15

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980) .....................................................................................7

OTHER AUTHORITIES

*Mechem on Agency,* 2d Ed., Vol. 1 ..........................................................................12

*Restatement (Third) of Agency* (2006) ...........................................................1, 9, 10, 12

## I.      Introduction

Plaintiff's First Amended Complaint, Dkt. 43 ("FAC"), is well-plead. First, the FAC establishes jurisdiction is proper. Beyond the complaint, Plaintiff provides evidence of McAfee's connection to the text messages, evidence which belies the testimony proffered by McAfee's employee declarant Jessica Hsu. *See* Dkt. 50. Second, McAfee only moves to dismiss one of two TCPA class claims – Count I, premised on the use of an automated telephone dialing system, a claim not addressed in McAfee's motion. Third, McAfee moves to dismiss Plaintiff's individual claim under the Indiana Deceptive Consumer Sales Act; however, Plaintiff has pleaded her claim for the incurable deceptive act with the particularity required by Fed.R.Civ.P. 9. As such, McAfee's motion should be denied.

## II.     Personal Jurisdiction Against Defendant Is Properly Exercised Here

Plaintiff's FAC alleges McAfee knew its marketing affiliates were texting Indiana area codes, and McAfee profited from this activity. *See* FAC at ¶¶ 4, 17. While McAfee claims it does not permit its affiliates to send text messages on its behalf, McAfee's own evidence shows at least four marketing affiliates have done so. *See* Dkt. 50 ("Hsu Decl.") ¶¶ 25-26.[1] This demonstrates a pattern and practice of text messages being sent from multiple McAfee agents – not an isolated occurrence limited to one rogue text message or marketing affiliate.

There is broad Circuit authority holding a defendant may be liable for the unlawful telemarketing acts of its affiliates, even when such defendant denies involvement or claims its affiliates are independent contractors. *See, e.g., United States v. Dish Network L.L.C.*, 954 F.3d 970, 975 (7th Cir. 2020)("The contract asserts that it does not create an agency relation, but parties cannot by ukase negate agency if the relation the contract creates is *substantively* one of agency. *Restatement (Third) of Agency* §1.02 (2006)."); *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 659 (4th Cir. 2019)(holding that

---

[1]      Defendant's motion and the Hsu Decl. fail to address all of the 23 text messages set forth in ¶ 36 of the FAC.

the TCPA contemplates a company can be liable for calls made on its behalf, even if not placed by the company, quoting TCPA § 227(c)(5), which permits claims by "[a] person who has received more than one telephone call within any 12-month period *by or on behalf of* the same entity."

Thus, based on Plaintiff's allegations and the exhibits to this memorandum, this Court should deny Defendant's motion to dismiss on jurisdictional grounds. McAfee is subject to specific jurisdiction based on established minimum contacts with this forum via its marketing affiliates. Indeed, Plaintiff shows specific personal jurisdiction based on the text messages sent to Plaintiff's Indiana telephone number, which should end this jurisdictional inquiry. When ruling on a motion to dismiss based on the submission of written materials regarding jurisdiction, without the benefit of an evidentiary hearing, the plaintiff "need only make out a *prima facie* case of personal jurisdiction." *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).

If the Court finds facts are in dispute, it should deny McAfee's motion to stay discovery (Dkt. 32), allow jurisdictional discovery, and hold an evidentiary hearing to resolve the question.

### A.      Background On McAfee's Marketing Strategies & Vendor Program

As Plaintiff alleged, McAfee pays third-party vendors to provide marketing services on its behalf. *See* FAC ¶¶ 2-7. The Hsu declaration contains noteworthy contradictions demonstrating McAfee's control over its affiliates. While Ms. Hsu states, "McAfee does not control, direct, manage, or oversee the manner and methods of the marketing vendors' or their subcontractors' work," she goes on to assert that McAfee (or its corporate subsidiary TunnelBear) does indeed place requirements on its marketing vendors and their subcontractors. *See* Dkt. 50 at ¶ 11 and Exs. I, J). In fact, Ms. Hsu produces Terms and Conditions ("T&C"), which require, inter alia, McAfee's marketing vendors must:

- Use traffic links as directed by McAfee;
- Use landing pages provided by McAfee;
- Restrict bidding on McAfee branded search engine traffic;
- Use only supplied promotions, discounts, and links to promote McAfee;
- Use only McAfee-provided coupon codes;

- Use only links and banner ads provided by McAfee;
- Comply with McAfee's trademark policy and brand guidelines, copywriting, and other intellectual property criteria and requirements;
- Use McAfee-approved creative imagery and messaging guidelines;
- Restrict push notifications unless approved by McAfee;
- Use of only one publisher ID to promote McAfee offers;
- Follow McAfee's guidelines for incentives;
- Agree to screen traffic sources regularly and any spend caps placed by McAfee; and
- Follow McAfee's creative imagery, brand, and messaging guidelines.

*See* Dkt. 50 at Exhs. I, J). Signing up to be a marketing vendor via McAfee's Affiliate Program is promoted as a simple way to earn passive income. *See* Ex. 1 (McAfee Marketing Affiliate Program Information). For each McAfee product sale, the McAfee affiliate earns at least $10.00, meaning that McAfee compensates its vendors for their marketing of McAfee products and services:

> McAfee is available on almost whatever device and platform they may want to use, wherever they use it. A competitive payout of $10 (minimum) to all publishers. Available by simple download, making for strong conversion through a clear user journey. Thousands of consumers are downloading from McAfee every day, you can be part of that success!

*See* Ex. 1. To participate in the McAfee affiliate program, McAfee requires that its affiliates agree to its special T&C (like the ones attached to the Hsu Decl. as Exs. I, J). This requirement imposes the necessary control to establish agency, as discussed further below.

McAfee's T&C impose express directions on its vendors, yet McAfee relies on those same terms to argue it "expressly forbids any of the independent marketing vendors it contracts with from sending any text messages on McAfee's behalf." Dkt. 51, PageID 447. But McAfee states, "**No SMS and MMS.** Short message service and multimedia messaging services are not allowed to promote McAfee."[2] Dkt. 50-9. On its face, a plain reading means the text message itself cannot advertise the McAfee brand or product. It does not "expressly forbid" the bulk of what was sent to Plaintiff's phone: text messages that did not all promote McAfee in the original text. Instead, many of the texts

---

[2]    SMS is the acronym for Short Message Service (text message limited to 160 characters) while MMS stands for Multimedia Messaging Service (allows for images, videos, or audio to be sent via a traditional cellular network).

contained clickable links that lead to a website initially offering another type of product for purchase or a promotional event before linking to a McAfee landing page. *See* illustration at Ex. 1.

McAfee knew this was occurring well before terminating its affiliates, willfully allowing the continuation of the texting campaign to Plaintiff (and countless other putative class members throughout Indiana and beyond) without taking any action to stop the texts that were driving business to its website until a lawsuit before this one was filed. Contrary to McAfee's contention that it polices and prohibits texting violations by affiliates,[3] McAfee provided notice to its marketing affiliates that they were in violation of terms *after* lawsuits were filed against McAfee. *See, e.g.*, Dkt. 50-3, 50-4, 50-5, 50-6, 50-7, 50-8. For example, as alleged in Case No. 22-cv-1568, Plaintiff Thomas Roehrman complained of receiving at least 28 text messages to his Indianapolis area code cellular phone (despite being registered on the Do Not Call ("DNC") Registry) during May and June of 2021—prior to the texts at issue in this matter.[4] Still, months later, from August 2021 to January 2022, Victoria Roehrman began receiving the violative text messages to her Indianapolis area code cellular phone (despite also being registered on the DNC Registry). Ms. Hsu's Declaration confirms that some of the same vendors were involved in texting Thomas and Victoria Roehrman (with separate Indianapolis phone numbers), but the termination of identified subcontractors did not occur until early 2022, **six months after** Mr. Roehrman's complaining text messages. *See* Dkt. 50-11 ("As per our communications in early 2022, we removed a source we believed caused the issue.")

As alleged in the FAC and corroborated by McAfee, Ms. Roehrman received a host of text messages that contained clickable links leading to URL hyperlinks, each of which identify the McAfee affiliate (or McAfee itself) and result in a McAfee landing page.[5] *See* Dkt. 50 at ¶¶ 25-26 (Hsu Decl.

---

[3]     *See* Dkt. 50, PageID 376 ("But if McAfee learns that a marketing vendor or a vendor's subcontractors have violated the Special T & Cs by using SMS or MMS messages, McAfee immediately takes a variety of steps.")

[4]     *See* Ex. 3 (Declaration of Thomas Roehrman).

[5]     *See* Ex. 2 (Declaration of Victoria Roehrman).

explaining how the hyperlinks were traced to four affiliate subcontractors). While specifics of this mechanism will be explored in discovery, McAfee, via its marketing vendors, was engaged in backward redirection marketing. Backward redirection marketing is a strategy whereby one company attempts to solicit its product or service and then, once a prospective customer attempts to leave the page, there is a "second chance" marketing opportunity by scripting a webpage to not return to the previous page, but to instead redirect to a page that has previously been selected, here, McAfee.[6] This is how McAfee knows which vendors earned commissions and how vendors are paid to drive business to McAfee.

The clickable links texted to Plaintiff resulted in redirects to McAfee's landing page, precisely how McAfee's affiliate program was designed to work. As reported by UpPromote:

> The McAfee affiliate program, managed by the CJ affiliate network, lets affiliates earn extra income by promoting McAfee consumer products... It's free and easy to apply through CJ. Once approved, you can access banner creatives, text links, and other materials for your website, content, and social platforms. You'll earn an affiliate commission when visitors click your McAfee affiliate links and make a purchase... Besides, the program offers a cookie duration that lasts for 30 days, so you earn a commission if they buy within a month.

*See* Ex. 1. Plaintiff can therefore establish how McAfee benefits from the text messages sent by its marketing vendors. McAfee, like most sellers, relies on third parties for marketing and advertising. This is one reason why the FCC recommends outsourced telemarketing not be a failsafe to liability:

> [T]he seller is in the best position to monitor and police TCPA compliance by third-party telemarketers. We thus agree that, consistent with the statute's consumer protection goals, potential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules. By contrast, allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, . . . suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

---

[6]     *See* Ex. 3 (Declaration of Thomas Roehrman).

*In re DISH Network, LLC*, 28 FCC Rcd 6574, 6588, 2013 FCC LEXIS 2057, *47-48, 58 Comm. Reg.
(P & F) 355 (F.C.C. 2013).

In short, Plaintiff received text messages, which directed her to McAfee landing pages, from
admitted McAfee-affiliated marketing vendors, months after McAfee had already received complaints
that its affiliates were sending text messages and, apparently, did not act. Given these facts, McAfee
cannot simply rely on its strategy of outsourced marketing and a self-serving contractual provision
stating text messages should not promote McAfee to avoid jurisdiction and, ultimately, liability.

**B.      McAfee's Marketing Vendors Sent Text Messages To Plaintiff's Indiana Cell**

Here, Plaintiff can establish that McAfee's contacts with Indiana relate to the text messages
she alleges violate the TCPA. *See Northern Grain Marketing, LLC v. Greving*, 743 F.3d 487, 492 (7th Cir.
2014)(*citing Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010)) ("To support an exercise of specific
personal jurisdiction, the defendant's contacts with the forum state must 'directly relate to the
challenged conduct or transaction.'") Plaintiff can also establish that McAfee has purposefully availed
itself of the privilege of conducting business here through its affiliate marketing relationships and that
her injury resulted from these forum-related activities. *See Northern Grain,* 743 F.3d at 492.

Plaintiff's Exhibit 2 provides an illustrative sampling of the text message screenshots and the
landing pages attributed to such texts. Plaintiff received the texts on her cellular phone in this
jurisdiction, on a number assigned an Indiana area code. This constitutes affirmative evidence
supporting jurisdiction and, to the extent Plaintiff's Declaration conflicts with Ms. Hsu's Declaration
stating that it is a violation of McAfee's T&C to send text messages promoting McAfee, "[U]nder the
prima facie standard, the plaintiff is entitled to have any conflicts in the affidavits (or supporting
materials) resolved in its favor." *Purdue Research*, 338 F.3d at 783.

Given the text messages at issue and their connection to McAfee, there is nothing fundamentally unfair about McAfee defending this action here.[7] *Purdue Research*, 338 F.3d at 780 (*citing World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). Multiple courts have previously held that calls or text messages sent to a phone number affiliated with a specific jurisdiction satisfy the test for exercising personal jurisdiction over the defendant. *See Keim v. ADF MidAtlantic, LLC.*, 199 F. Supp. 3d 1362, 1367 (S.D. Fla. 2016); *Payton v. Kale Realty, LLC*, No. 13 C 8002, 2014 U.S. Dist. LEXIS 118590, at *8 (N.D. Ill. Aug. 26, 2014); *Luna v. Shac, LLC*, No. C14-00607 HRL, 2014 U.S. Dist. LEXIS 96847, at *12 (N.D. Cal. July 14, 2014); *Baker v. Caribbean Cruise Line, Inc.*, No. CV 13-8246-PCT-PGR, 2014 U.S. Dist. LEXIS 28960 (D. Ariz. Mar. 6, 2014). This Court should similarly so find.

## C.     McAfee's Agents' Conduct Renders McAfee Subject To Specific Personal Jurisdiction

Specific personal jurisdiction is appropriate where: (1) the defendant has purposefully directed its activities at the forum state or purposefully availed itself of the privilege of conducting business in that state; and (2) the alleged injury arises out of the forum-related activities. *See Tamburo*, 601 F.3d at 702.  Purposeful direction, most often used in tort rather than contract cases (when the purposeful availment standard is used), is evaluated under the *Calder v. Jones*, 465 U.S. 783 (1984) test: (1) commission of an intentional act; (2) expressly aimed at the forum state; (3) causing harm that the defendant knows is likely to be suffered in the forum state. "Defendant" means the defendant directly or its agent because, under the TCPA, for liability to attach, "the caller must either (1) directly make the call, or (2) have an agency relationship with the person who made the call." *Garvey v. Keller Williams*

---

[7]     Ms. Hsu states that McAfee earns 1.6% of its United States revenue from sales generated from within Indiana. *See* Dkt. 50, ¶ 7. McAfee's average annual revenue for the U.S. over the past five years is approximately 1.31 billion. *See* https://businessquant.com/mcafee-corp-revenue-breakdown-by-region (last visited July 30, 2024). *See* also https://www.mcafee.com/es-pe/consumer-corporate/newsroom/press-releases/press-release.html?news_id=ce7fdd23-bf93-4718-ac5b-4f912a01408a&a8=v4ucY (last visited July 30, 2024 (showing 2020 revenue of $2.9 billion) to McAfee. This translates to revenues in Indiana in the ballpark of $32 Million.

*Realty, Inc.*, No. 2:23-cv-00920, 2024 U.S. Dist. LEXIS 80814, at *2 (D. Nev. May 2, 2024)(*citing Gomez v. Campbell-Ewald Co.*, 768 F.3d 871 (9th Cir. 2014)).

Therefore, specific jurisdiction exists even if Defendant did not itself engage in allegedly violative and tortious conduct so long as its agents did. "The forum related activities of an agent and a subagent are imputable to the principal and are counted as the principal's contacts for jurisdictional purposes." *ABN AMRO, Inc. v. Capital International, Ltd.*, 595 F. Supp. 2d 805 (N.D. Ill. 2008). Moreover, Indiana's long arm statute expressly authorizes personal jurisdiction over a person for acts done "through an agent." Indiana Trial Rule 4.4 ("Any person or organization that is a nonresident of this state, a resident of this state who has left the state, or a person whose residence is unknown, submits to the jurisdiction of the courts of this state as to any action arising from the following acts **committed by him or her or his or her agent**.") (emphasis added). Given that agents' acts can be imputed to McAfee for jurisdictional purposes, McAfee insists its marketing affiliates are not agents, but this claim is belied by available facts.

### 1.    Plaintiff's Implied Agency & Ratification Allegations

Properly demonstrating agency, Plaintiff alleges as follows: McAfee pays its marketing affiliate program vendors to generate traffic to McAfee's website to promote sales (FAC, ¶ 4); McAfee provides its vendors with landing pages, promotions, discounts, and links to promote McAfee (FAC, ¶ 4); McAfee continues to benefit from its vendors' leads, even after they are terminated from the affiliate program, given that some of Plaintiff's text message links continue to be routed to McAfee landing pages (FAC, ¶ 4); McAfee provides its vendors with marketing messaging, materials, brand guidelines, and resources and uses McAfee program managers to monitor vendor activities and sales (FAC, ¶ 24); McAfee requires its vendors to use marketing language that benefits McAfee (FAC, ¶ 24); McAfee can revoke vendor authority for specific ad campaigns, giftcard promotions, and messaging language (FAC, ¶ 24); and McAfee possesses information from which it can determine the

origins of a product purchase on its website to pay the right affiliate (FAC, ¶ 45). Further, McAfee's marketing vendors would have no reason to believe that McAfee objected to how the referrals were made (including those made via backward redirection marketing originating from a text advertising a different product) when the evidence shows its vendors sent texts for months after McAfee was warned consumers were receiving them. *See* Ms. Hsu's Declaration at Dkt. 50-11, PageID 426, noting some subcontractors of vendors were terminated more than six months after texts were sent to Thomas Roerhman, as alleged in his complaint (source removed in early 2022).

These allegations support a finding that McAfee vendors are its agents through either implied actual authority or ratification.

### a)      Implied Actual Authority

Actual authority exists when "at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent to so act." *Restatement (Third) of Agency* § 2.01 (2006). McAfee's marketing vendors are reasonable in their belief that text messaging, which results in redirection marketing will not be punished because the links they use to direct text recipients to McAfee result in commission payments.

Therefore, McAfee's reliance on *Moore v. Charter Communs., Inc.*, 523 F. Supp. 3d 1046 (N.D. Ill. 2020), where the court disagreed with the plaintiff's agency theory in a TCPA case, is misplaced. In *Moore,* the district judge doubted the plaintiff's allegations of implied actual authority for agency purposes because plaintiff did not "plausibly explain" why the alleged agent would believe the defendant consented to its affiliates' telemarketing calls when the parties' marketing agreement prohibited outbound telemarketing calls. *Id. at* 1052. That is not the case here.

First, while language appears in McAfee's agreement prohibiting text messages promoting McAfee, the bulk of violative text messages here do not directly advertise McAfee and thus fall outside

9

of the allegedly prohibited conduct. McAfee's agents' text messages instead eventually direct the text recipient to McAfee through a series of links. Second, McAfee's vendors are provided with the landing pages from McAfee and a longer than typical 30-day cookie[8] window – if the vendor isn't receiving any evidence that McAfee is refusing payouts to them given the long time period during which the vendor can claim an attributed re-direct, there is no incentive to modify its conduct to stop texting. And third, the only evidence McAfee presents of vendors being terminated for texting was in response to litigation (and in this case, after McAfee decided to contest jurisdiction), not through a normal review or audit of vendor practices. McAfee instead provides evidence that it continues to employ vendors it knew had texting subcontractors.[9] Prior acquiescence to unauthorized transactions may lead the agent to believe "that the principal does not intend a particular instruction or a type of instruction to be taken seriously." *Moore*, 523 F. Supp. 3d at 1052 (*citing Restatement (Third) of Agency* § 2.02, Reporter's Note to Comment f.)

Further, McAfee cannot solely rely on contractual agreements with its vendors to claim they are independent contractors and not agents. In its own cited case of *CFTC v. Gibraltar Monetary Corp.*, the court noted, "[e]xpress disclaimers of agency do not necessarily eliminate the existence of an agency relationship." *CFTC v. Gibraltar Monetary Corp.*, 575 F.3d 1180, 1189 (11th Cir. 2009)(*citing Carr v. StillWaters Development Co., L.P.*, 83 F. Supp. 2d 1269, 1279 (M.D. Ala. 1999)("Otherwise, parties

---

[8]     "Cookie windows, aka cookie durations, are how long a cookie is coded to last in a customer's browser from the initial click. Some stores only offer 1-day windows, but some cookie durations last up to 30 days – or longer! This means you have a longer, better chance of getting a commission on a sale that you influenced, and it also means you should aim to link to stores with longer cookie durations, to maximize your potential earnings." https://www.magiclinks.com/blog/affiliate-marketing-101-what-is-cookie-duration-and-why-is-it-important-to-influencers/(last visited July 16, 2024).

[9]     McAfee maintains its relationships with Yep Ads and Adstart, only demanding as part of its defense to this suit that they "cease and desist from any and all noncompliant conduct and from utilizing for any McAfee-related business or communications the sub-publisher who is responsible for the non-compliant conduct of which Ms. Roehrman has complained…" There was no demand for repayment of commissions. *See* Dkt. 50-4, PageID 401; Dkt. 50-5, PageID 404.

could enjoy the benefits of an agency relationship free of legal consequences simply by the insertion of a disclaimer clause in the agency contract.")) Yet McAfee relies on the language of its contract – that's the evidence Ms. Hsu cites to in support of her statement that, "The contracts with each marketing vendor make clear that those vendors are independent contractors…the contract defines the relationship between the parties as independent contractors." Dkt. 50, ¶ 13.  Ms. Hsu then makes several conclusory statements to minimize McAfee's involvement with its vendors but, "The key to finding the existence of an agency relationship is control." *Carr*, 83 F. Supp. 2d at 1279; *Jenkins v. National Grid USA*, No. 15-CV-1219, 2017 U.S. Dist. LEXIS 49365, at *23 (E.D.N.Y. Mar. 31, 2017). Here, McAfee's control over its vendors exists given the litany of agent behavior that McAfee dictates, including requirements to use specific approved links, landing pages, promotions, discounts, coupon codes, banner ads, messaging, and imagery.  McAfee also requires that agents restrict their push notifications and screen sources of traffic, plus comply with McAfee's trademark policy and brand guidelines, copywriting and other intellectual property criteria and requirements.

In *Bilek v. Federal Insurance Co.*, 8 F.4th 581 (7th Cir. 2021), the plaintiff's agency theory was deemed plausible at the pleadings stage because Bilek alleged that the agents initiated robocalls that solicited the alleged principal's product; the alleged principal authorized the use of approved scripts, its trade name, and other proprietary information; and another third party vendor who the principal contracted with was involved with the quoting and sales process. The same facts exist here. Plaintiff alleges that McAfee's agents sent texts that solicited McAfee products and services through internet marketing tools. She also alleges that these agents were using McAfee-approved click links, as evidenced by the links leading to McAfee landing pages (with embedded source code to allow McAfee to determine which of its vendors was involved). And finally, Plaintiff alleges (and McAfee admits) that the texts were sent by McAfee Affiliate Program vendors, not rogue entities.

Agency may be established even when the principal lacks the right to control the full range of the agent's business activities. *See Bilek*, 8 F.4th at 588. As such, Ms. Hsu's statements that McAfee does not hire, train, or supervise its marketing agents' staff or dictate terms of the agents' workday are not dispositive. What matters are Plaintiff's allegations that McAfee's marketing vendors sent texts, which ultimately led to the advertisement of McAfee's products, using the very landing pages McAfee tells its vendors to use via its Affiliate Program. *See Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 830 (N.D. Ill. 2016)("If these arguments were valid, an entity could avoid TCPA liability by empowering an agent to make prerecorded calls encouraging consumers to visit the principal's store so long as the agent did not say the principal's name and did not attempt to make a sale on the phone call. This narrow a reading of the TCPA would undermine the law's purpose…")

### b)     Ratification

Even if this Court is not persuaded that McAfee's vendors had implied actual authority to promote McAfee, Defendant is still bound by its vendors' conduct through ratification. Ratification does not require an agency relationship as "Ratification may create a relationship of agency when none existed between the actor and the ratifier at the time of the act." *Restatement 3d of Agency*, § 4.01 (1) at Comment B. "It is an established rule of agency that a subsequent ratification of the act of the agent is equivalent to an original authorization." *Alterman v. Lydick*, 241 F.2d 50, 53 (7th Cir. 1957). "[T]he principal cannot be justified in willfully closing his eyes to knowledge. He cannot remain ignorant where he can do so only through intentional obtuseness. He cannot refuse to follow leads, where his failure to do so can only be explained upon the theory that he preferred not to know what an investigation would have disclosed." *Id.* (*citing Mechem on Agency*, 2d Ed., Vol. 1, p. 296).

While Roehrman does not allege she purchased a McAfee product after receiving the text messages from McAfee's vendors, McAfee only presents evidence that these vendors were contacted and asked to stop texting after lawsuits were filed, and not after McAfee learned consumers were

receiving text messages that allegedly violated McAfee policy. McAfee therefore knowingly accepted

leads from vendors it had evidence were sending misleading and deceptive text messages. This is

sufficient to allow the case to proceed under a ratification theory:

> Specifically, Berkley's Rule 30(b)(6) witness testified that in May 2012, Berkley became aware (from a Fox News report and an email from Lambert) that call recipients were complaining about the calls and that a lawsuit might be imminent. The call campaign continued through August, and although Berkley points to evidence that it made an attempt to either cease any unlawful conduct or no longer receive referrals arising out of unlawful calls, it does not identify evidence that it took any steps to ensure that it would no longer receive leads generated through potentially unlawful calls. A reasonable jury could conclude from this evidence that CCL, VOMT, and Berkley all knew that ESG was placing unlawful calls to gin up business for them and accepted the benefits from this campaign.

*Aranda*, 179 F. Supp. 3d at 833.

McAfee had sufficient knowledge that its vendors were sending text messages prior to the

conduct alleged in Plaintiff's complaint. It does not provide evidence that it took any immediate action

to stop such advertising campaigns and instead continued the use of McAfee landing pages.

## 2.   Alternatively, Jurisdictional Discovery Should Proceed

If this Court deems it necessary to further explore the statements made by the parties with

material facts in dispute, jurisdictional discovery should be permitted, with a hearing thereafter. *See*

*Hyatt International Corp. v. Coco,* 302 F.3d 707, 713 (7th Cir. 2002)("if personal jurisdiction is challenged

under Rule 12(b)(2), the court must decide whether any material facts are in dispute. If so, it must

hold an evidentiary hearing to resolve them…")

As noted in Plaintiff's response to Defendant's motion to stay discovery, which was taken

under advisement, there are areas of discovery that would further elicit relevant data, including but

not limited to: (a) the dates and payments made to violating affiliates; (b) details regarding the action

taken after McAfee discovered former sub-affiliate TCPA violations; (c) any communications between

McAfee, its subsidiary TunnelBear, and the violating subcontractors; (d) the content and timing of

permissions provided by McAfee to the violating subcontractors for use of McAfee landing pages,

promotions, and URLs; and (e) any re-direction policies or practices McAfee employs with affiliate links, and, for any affiliates who were terminated or no longer work with McAfee, how McAfee's website is still linked to the original texts sent to Plaintiff's Indiana telephone number. *See* Dkt. 36.

When a plaintiff makes a colorable argument that personal jurisdiction exists, discovery on that topic is permitted. *See Snap-On, Inc. v. Robert Bosch LLC*, No. 09 C 6914, 2012 U.S. Dist. LEXIS 174217 at *7-8 (N.D. Ill. Dec. 10, 2012)(*citing Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000)). *See also Spiegel v. Reynolds*, No. 15 C 8504, 2016 U.S. Dist. LEXIS 161642, at *8 (N.D. Ill. Nov. 22, 2016). In *Spiegel,* the defendants claimed a third party who was not their "agent" placed telemarketing calls in violation of the TCPA. Since defendants disavowed the third party's conduct, they argued they had insufficient contacts with the forum state to support personal jurisdiction. Nonetheless, the court granted plaintiffs leave to conduct jurisdictional discovery because plaintiffs alleged that the defendants shared in profits from the third party's telemarketing calls and therefore, they could be held responsible for the calls coming into the state, even if generated by the third party. *Id.* at *16, *19 ("A period of jurisdictional discovery will be allowed. Discovery may reveal additional facts that would be helpful to resolving this factual dispute.")

At minimum, Plaintiff has submitted sufficient evidence to raise a genuine dispute of material facts relevant to agency and vicarious liability. The Court must therefore at least grant Plaintiff leave to conduct jurisdictional discovery, if it determines it cannot deny Defendant's jurisdictional motion based on the facts presented herein.

## III.   McAfee Misconstrues Plaintiff's TCPA § 227(b)(1)(A) Claim

Count I of Plaintiff's Complaint seeks redress for McAfee's use[10] of an automatic telephone dialing system ("ATDS") to send misleading marketing texts, *en masse,* to Plaintiff and the putative

---

[10]     Plaintiff alleges that several of McAfee agents sent text messages to Plaintiff and the putative class on McAfee's behalf. FAC at ¶ 51; *see also* ¶¶ 24-26 and 2-7.

class. Plaintiff does not advance her claim on the premise that McAfee's texts contained an artificial or prerecorded voice component. Specifically, as alleged in the FAC:

> It is a violation of the TCPA to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) **using any automatic telephone dialing system** or an artificial or prerecorded voice to any telephone number assigned to a cellular telephone service. 47 U.S.C. § 227(b)(1)(A)(iii).

FAC at ¶ 49 (emphasis added).

Without disputing that the subject text messages are "calls" (using an ATDS) (Dkt. 51 at p.22), McAfee's motion curiously omits the portion of TCPA § 227(b)(1)(A) that governs <u>automated</u> calls, only discussing whether there is a voice component. A violation for use of an ATDS presents an alternative theory to claims arising from the use of an "artificial" *or* "prerecorded voice" under this TCPA provision. The availability of alternate theories of liability is evident from the disjunctive wording (*i.e.,* "or") used in this provision. *Marshall v. Grubhub Inc.*, No. 19-CV-3718, 2021 WL 4401496, at *5 (N.D. Ill. Sept. 27, 2021)(allegation regarding the ATDS constitutes an alternative legal theory – one that she may or may not be able to substantiate with the benefit of discovery); *see also Weekly v. Fifth Third Bank*, No. 20-CV-01786, 2020 WL 7626737, at *3 (N.D. Ill. Dec. 22 2020)("it would be impossible for any plaintiff to know about a system's capacity prior to discovery"). This is well-settled law; *see, e.g., Cartrette v. Time Warner Cable, Inc.*, 157 F. Supp. 3d 448, 458 (E.D.N.C. 2016)(prohibition on prerecorded calls is independent of TCPA's prohibition of autodialed calls); *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 725 (S.D.N.Y. 2015)(the TCPA's "plain language applies to both prerecorded voice messages and use of an ATDS; they are alternative theories of liability"), *vacated and remanded on other grounds*, 894 F.3d 473 (2d Cir. 2018).

McAfee posits in a footnote that the well-reasoned interpretations of the FCC, with decades of oversight of TCPA regulation has "little relevance" (Dkt. 51 at fn 7) given the overturning of *Chevron* deference. However, the two published decisions addressing the FCC's opinions since *Loper Bright Enters. v. Raimondo,* 2024 WL 3208360, at *22 (U.S. June 28, 2024) have found otherwise. *See Lyman v.*

*QuinStreet, Inc.,* 2024 WL 3406992, at *4 (N.D. Cal. July 12, 2024)("[T]he Court needs only "independently identify and respect such delegation[] of authority, police the outer statutory boundaries of [that delegation], and ensure that [the agency exercises its] discretion consistent with the APA." Here, Congress has expressly conferred discretionary authority on the agency to flesh out the TCPA. *See* 47 U.S.C. § 227(c). Using its discretion within the boundaries of its delegation, the agency has created a presumption that a cell phone registered on the DNC Registry is a residential phone, a presumption that has lasted for more than two decades. *See* 47 C.F.R. § 64.12000(e). The FCC's interpretation "rests on factual premises within the agency's expertise," thus giving its interpretation "particular power to persuade, if lacking power to control." In this context, it is "especially informative" and particularly persuasive. *Id.* In any event, however, the Court would reach the same conclusion in the absence of any FCC interpretation of the TCPA's statutory text.")(internal citations to *Loper Bright* omitted). *Cacho v. McCarthy & Kelly LLP*, 2024 WL 3293628, at *5–6 (S.D.N.Y. July 3, 2024)(declining to upend decades of well-reasoned precedent while applying the relevant interpretive tools under *Loper Bright*).

What Defendant contends as "irrelevant" is tantamount to a sea change of legal authority dating back over 20 years. Since the FCC first ruled that texts were calls under the TCPA in 2003, this finding has been reiterated in countless TCPA cases. *See In re* Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, at ¶ 165 (F.C.C. July 3, 2003)(finding the TCPA's restriction on autodialed or prerecorded voice calls "encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls.") In 2016, the Supreme Court endorsed this view, holding that "[a] text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016)(referring to the TCPA's restriction on autodialed or prerecorded calls to cell phones), *aff'g* 768 F.3d 871 (9th Cir. 2014). *Accord Barr v. Am. Ass'n of Pol.*

*Consultants, Inc.,* 591 U.S. 610 (2020)(the robocall restriction "bars both automated voice calls and automated text messages").

As the *Lyman* court reasoned, there is ample authority and basis beyond the FCC's holding. The TCPA's applicability to text messages without a voice component is particularly clear since, in § 227(b)(1)(A)(iii), Congress specifically restricted calls to pagers, treating them exactly like cell phones. Pagers, now obsolete, functioned exactly like a very limited, primitive text messaging system; they enabled a message, originally consisting of just a telephone number, to be sent through a telephone line to the recipient. *See* Mary Bellis, ThoughtCo., History of Pagers and Beepers (Sept. 10, 2018), *available at* www.thoughtco.com. By 1990, the year before the TCPA was enacted, a pager could receive up to four lines of alphanumeric text and was "a prototype for text messaging." Brian Santo, IEEE Spectrum, The Consumer Electronics Hall of Fame: Motorola Advisor Pager (Jan. 3, 2019), *available at* https://spectrum.ieee.org. So, the absence of binding FCC authority aside, by including pagers in the autodialed call prohibition, Congress unambiguously expressed concern about text messages as well as voice calls.

Accordingly, because McAfee's motion fails to address the substance of the actual claim advanced by Plaintiff and the putative class, and then cannot sustain its argument that a text must have a voice component to be covered by the TCPA, dismissal of Count I is inappropriate.

## IV.   Plaintiff's Indiana DCSA Claim is Well Plead

Plaintiff's FAC alleges that McAfee's marketing vendors intentionally misled Plaintiff by falsely representing, *inter alia,* that her device was infected with a virus to drive traffic (*i.e.,* profits) to McAfee. FAC ¶ 80. Plaintiff alleges the marketing vendors were each agents of McAfee. *Id.* at ¶¶ 24-26 and 51. Her claim of an incurable deceptive act is aptly plead to meet the particularity requirement set forth by the Seventh Circuit, "in that it identifies the "who, what, when, where, and how" of the alleged

fraud. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019)(*citing Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019)).

The FAC alleges "who" – McAfee, through its marketing vendors, alleging:

80.   McAfee's marketing vendors' actions were part of a scheme, artifice, or device with intent to defraud or mislead by suggesting Plaintiff's device was infected with a virus, when that was untrue, in violation of I.C. 24-5-0.5- 2.

FAC ¶ 80. Plaintiff's allegations are also clear that McAfee's marketing vendors are its agents, obviating McAfee's purported confusion as to McAfee's alleged culpability. The FAC provides:

24.   McAfee is vicariously liable for any texts placed by its agents, representatives, and third parties with whom McAfee contracted because, (a) McAfee provides its vendors with marketing messaging, materials, brand guidelines, and resources and uses McAfee program managers to monitor vendor activities and sales, (b) McAfee's vendors are required to use marketing language that benefits McAfee, and (c) McAfee retains specific rights to revoke vendor authority for specific ad campaigns, giftcard promotions, and messaging language.

25.   McAfee is vicariously liable for its vendors' campaign of violative texts under agency theories, as stated in *In re Joint Petition Filed by Dish Network, L.L.C.,* 28 F.C.C. Rcd. 6574 (F.C.C. 2013), and *In re Monitronics Int'l, Inc.*, 2014 U.S. Dist. LEXIS 10028, *16-17, 2014 WL 316476, *citing In re Joint Petition*, 28 F.C.C. Rcd. at ¶ 28.

26.   McAfee acted as a principal to its marketing vendors and ratified, permitted, and enjoyed the benefits of the texting campaign. To date, multiple links sent to Plaintiff's phone still send the consumer to McAfee's website for product purchase.

51.   McAfee, through its agents, sent telemarketing texts to Plaintiff's cellular telephones and the other putative class members, defined below.

FAC ¶¶ 24-26 and 51. *See also id.* at ¶¶ 2-7, detailing the Marketing Affiliate Program, whereby McAfee pays vendors to generate traffic to McAfee's website and sell McAfee products. These allegations are similar to *Outzen v. Kapsch Trafficcom USA, Inc.,* 2021 WL 914021, at *11 (S.D. Ind. Mar. 10, 2021), where the court rejected an argument similar to McAfee's because agency and principles of vicarious liability were alleged.

The "what, when, where, and how" is apparent by a myriad of allegations throughout the 17-page complaint, including:

18

7.  The marketing texts sent for McAfee's benefit by its marketing vendors were also contrary to the DCSA because, inter alia, such texts falsely led Plaintiff to believe her phone was infected with a virus or its usage may be compromised when that was untrue. This attempt to coerce Plaintiff to clean her phone with McAfee products instilled fear and was therefore unfair, deceptive, and unconscionable.

35.  At least twenty-three (23) telemarketing text messages traced to McAfee's products and services were sent to Plaintiff. These messages contained clickable links that either directly led to www.mcafee.com without detour or led to a McAfee advertisement after back button clicks were performed when attempting to leave the webpage.

FAC at ¶¶ 7 and 35. Also, *see* ¶ 36 setting forth "[a]n inexhaustive list of these text messages to Plaintiff on behalf of McAfee by its agents, which further detail "what" misrepresentations were made. The FAC also details "when" – specifically stating the date and time of these 23 examples. And, of course, the "where" and "how" are evidenced throughout as being delivered via the subject text messages.

As to the issue of intent or scienter, Fed. R. Civ. P. 9 instructs explicitly that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Notwithstanding, the FAC alleges a calculated scheme devised by McAfee to drive business to its site (*supra*), thereby manifesting an intent to mislead recipients of the texts, like Plaintiff, to procure McAfee's antivirus or other such services. McAfee, through its agents, purposefully sent more than 20 false and misleading texts. *See* FAC at ¶ 13 ("false representations [of the robotexts] caused anxiety, worry, and fear, causing recipients to connect to McAfee's site selling its services.")

Courts in this Circuit have found similar such pleadings sufficient. *See Outzen,* 2021 WL 914021, at *12 (dismissal denied where "Complaint alleges a calculated scheme devised by Defendants manifesting their clear intent to mislead motorists into paying unwarranted additional fees (*see, e.g.*, Filing No. 1-2 at 8; *see also* Filing No. 27 at 33 (arguing that Plaintiffs have not alleged a 'scheme, artifice or device' under the IDCSA"); *Elward v. Electrolux Home Prod., Inc.,* 264 F. Supp. 3d 877, 893 (N.D. Ill. 2017)("By pleading facts about Electrolux's conduct that could constitute a deceptive, intentional omission, and given the IDCSA's directive to liberally construe its terms, the Becks have

stated a cognizable claim under the IDCSA. Also, in accord with these decisions, and contrary to McAfee's assertion in its motion (Dkt. 51 at p.23), the *Castagna* court denied dismissal of one of the IDCSA claims for failing to allege a deceptive act because plaintiff's complaint specifically alleged that the plaintiff relied on representations that concealed a defect in the purchased RV. *See Castagna v. Newmar Corp.,* 2016 WL 3413770, at *8 (N.D. Ind. June 22, 2016).

Accordingly, the FAC meets all pleading requirements for a claim under the IDCSA.

## IV.     Conclusion

As set forth herein, jurisdiction is proper in this Court, and further, Counts I and III are well plead, making dismissal inappropriate here. For these reasons, McAfee's motion should be denied.


Respectfully submitted,

*/s/ Amy L. Wells*
Amy L. Wells, admitted *pro hac vice*
Wells Law Office, Inc.
122 S. Michigan Avenue, Suite 1390-145
Chicago, Illinois 60603-6036
(773) 762-9104
amywells@equaljusticelaw.com

Stacy M. Bardo, admitted *pro hac vice*
Bardo Law, P.C.
203 North LaSalle Street, Suite 2100
Chicago, Illinois 60601
(312) 219-6980stacy@bardolawpc.com

John T. Steinkamp
John Steinkamp & Associates
5214 S East St. Suite D1
Indianapolis, IN 46227
(317) 780-8300
John@johnsteinkampandassociates.com

**Counsel for Plaintiff & the Putative Class**


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this filing was served upon all parties through their counsel of record through the Court's ECF System upon filing.

*/s/ Amy L. Wells*
Amy L. Wells, admitted *pro hac vice*