UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VICTORIA ROEHRMAN, *Plaintiff*, | ) | |
| v. | ) | No. 1:23-cv-02146-JMS-MG |
| MCAFEE, LLC, *Defendant*. | ) | |

**ORDER**

Plaintiff Victoria Roehrman received bothersome text messages from a contractor of a contractor — or perhaps even a contractor of a contractor of a contractor — of Defendant McAfee, LLC ("McAfee"). She now claims that McAfee is liable under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") and the Indiana Deceptive Consumer Sales Act, Ind. Code 24-5-0.5-3(a), (b)(19) ("IDCSA") [Filing No. 43 at 11-18.] McAfee has filed a Motion to Dismiss for lack of personal jurisdiction and to dismiss certain counts for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(2) and (12)(b)(6). [Filing No. 49.] McAfee has also filed a Motion to Strike certain declarations filed by Ms. Roehrman. [Filing No. 65.] Each Motion is ripe for the Court's consideration.

## I.
## MOTION TO DISMISS BASED ON LACK OF PERSONAL JURISDICTION

### A. Standard of Review

When a defendant's motion to dismiss for lack of personal jurisdiction "is based on the submission of written materials, without the benefit of an evidentiary hearing, the plaintiff need only make out a prima facie case of personal jurisdiction." *GCIU-Emp. Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009). "To decide whether a plaintiff has satisfied that

minimal burden, the Court consider[s] the record in its entirety," including "the facts from the well-pleaded allegations in [the plaintiff's] complaint and the declarations submitted by both parties," drawing "all inferences in [the plaintiff's] favor." *B.D. ex rel. Myer v. Samsung SDI Co.*, 91 F.4th 856, 859, 864 (7th Cir. 2024) (quotation omitted). "[B]ut this does not mean that the judge will just take the plaintiff's word about what happened." *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). "The affidavit of the party asserting personal jurisdiction is presumed true only until it is disputed. Once disputed, the party asserting personal jurisdiction . . . must prove what [she] has alleged." *Durukan Am., LLC v. Rain Trading, Inc.*, 787 F.3d 1161, 1163-64 (7th Cir. 2015). The Court "accept[s] as true any facts contained in the defendant's affidavits that remain unrefuted by the plaintiff." *GCIU-Emp. Ret. Fund.*, 565 F.3d at 1020 n.1. At all times, the "[p]laintiff has the burden of demonstrating the existence of personal jurisdiction." *RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1276 (7th Cir.1997).

**B. Background**

*1. McAfee's Background*

McAfee is a "global computer security software company that provides cybersecurity solutions for businesses and consumers." [Filing No. 50 at 1.] It is incorporated in Delaware and has its principal place of business in California. [Filing No. 50 at 1.] McAfee earns only a fraction of a percentage of its global revenue from Indiana. [Filing No. 50 at 2.] McAfee "does not lease, own, or otherwise maintain any corporate offices or real estate assets in Indiana." [Filing No. 50 at 2.] And of McAfee's nearly 2,000 employees, only one works in Indiana. [Filing No. 50 at 2.] That one employee is not an executive. [Filing No. 50 at 2.]

To market its products, McAfee has a global partnership program. [Filing No. 50 at 1.] "[T]o conduct non-texting marketing campaigns for McAfee products," McAfee sometimes engages third-party vendors. [Filing No. 50 at 2.] Those vendors, in turn, sometimes engage

subcontractors. [Filing No. 50 at 2.] McAfee's "contracts with each marketing vendor" state that "those vendors are independent contractors." [Filing No. 50 at 3.] McAfee "does not hire, train, or supervise its marketing vendors' staff or the staffs of their subcontractors." [Filing No. 50 at 3.] McAfee "has no say in the days and hours of its marketing vendors' or their subcontractors' operations." [Filing No. 50 at 3.] And McAfee "does not provide its marketing vendors or their subcontractors with office space or equipment to conduct their business." [Filing No. 50 at 3.]

"[B]efore performing any work on McAfee's behalf," McAfee's vendors all must agree to McAfee's Special Terms and Conditions. [Filing No. 50 at 4.] The Special Terms and Conditions obligate the vendors "to ensure any third party they engage to perform marketing services for McAfee abides by all applicable laws, rules, regulations, [and] guidelines, and that no entities working on McAfee projects engage in illegal activity." [Filing No. 50 at 3.] The Special Terms and Conditions "expressly state" that in promoting McAfee, "no SMS or MMS text messages are allowed." [Filing No. 50 at 5.]

*2. Subcontractors' Text Messages*

"On or about August 3, 2021," Ms. Roehrman received "a litany of telemarketing text messages" from McAfee's alleged vendors without her consent. [Filing No. 43 at 6-7.] Some messages insisted that Ms. Roehrman's phone was "infected with a dangerous virus." [Filing No. 43 at 10.] Others claimed that Ms. Roehrman "received a refund or won a prize." [Filing No. 43 at 10.] Each contained a hyperlink allegedly redirecting to McAfee's website. [Filing No. 43 at 7-10 (list of hyperlinks).] Ms. Roehrman clicked on some of these links, and experienced "frustration, annoyance, [and] irritation," but did not purchase any products from McAfee. [Filing No. 43 at 10-11.]

*3. McAfee's Investigation of the Text Messages*

After receiving complaints about the text messages received by Ms. Roehrman, McAfee's Director of Marketing, Jessica Hsu, followed some of those text messages' hyperlinks to investigate their source. [Filing No. 50 at 4.] Director Hsu determined that they came from a marketing-vendor's subcontractors. [Filing No. 50 at 5.] McAfee sent cease-and-desist letters to each subcontractor, and although one has not responded, the remaining subcontractors agreed that such text messages violate McAfee policy and either investigated or terminated their own sub-subcontractors. [Filing No. 50 at 7.] Director Hsu herself "confirmed that McAfee has no records showing that [Ms.] Roehrman ever purchased any McAfee products." [Filing No. 50 at 8.]

*4. Ms. Roehrman's Lawsuit*

Ms. Roehrman initiated this lawsuit on November 30, 2023, and alleges in the operative Amended Complaint that "McAfee, via third party agents . . . calling on its behalf, initiated telephone solicitations promoting McAfee's services to her cellular telephone number." [Filing No. 43 at 1.] She alleges that these solicitations make McAfee liable under the TCPA and the IDCSA. [Filing No. 43 at 11-18.] She brings her claims on behalf of putative classes of individuals who received such text messages without consent, who told the text-message sender to stop, or whose telephone number was included on the National Do-Not-Call registry. [Filing No. 43 at 13-14.] McAfee has filed a Motion to Dismiss in which it argues, among other things, that the Court does not have personal jurisdiction over it. [Filing No. 49.]

**C. Discussion**

McAfee argues that Ms. Roehrman's case should be dismissed for lack of personal jurisdiction because there is "no prima facie case of specific jurisdiction."[1] [Filing No. 51 at 15.]

[1] Ms. Roehrman does not contend that the Court has general jurisdiction over McAfee.

McAfee argues that specific jurisdiction for Ms. Roehrman's TCPA claims would require that McAfee be "directly or vicariously liable for sending the texts," but in this case, the vendors' subcontractors are not agents and had no authority to bind McAfee as principal. [Filing No. 51 at 16-17.] McAfee states that "there's no principal-agent relationship at all," and that "as the agreements make clear, McAfee's relationship with its marketing vendors is that of independent contractor, not agent." [Filing No. 51 at 17.] McAfee states that it "did not send, or authorize anyone else to send, the texts that form the basis of [Ms.] Roehrman's claims," which necessarily "do not arise out of or relate to any conduct that McAfee aimed at Indiana." [Filing No. 51 at 15.]

Ms. Roehrman argues that the marketing vendors' subcontractors' conduct "renders McAfee subject to specific personal jurisdiction" because they were McAfee's agents. [Filing No. 58 at 12.] Ms. Roehrman states that they were acting with implied actual authority because they "reasonably believe[d]" that "text messaging" "will not be punished because the links they use to direct text recipients to McAfee result in commission payments." [Filing No. 58 at 14.] Ms. Roehrman states that "the bulk of violative text messages . . . do not directly advertise McAfee and thus fall outside of" McAfee's agreement prohibiting promotions via text message. [Filing No. 58 at 14-15.] Ms. Roehrman argues that vendors do not "receiv[e] any evidence that McAfee is refusing payouts," so "there is no incentive to modify its conduct to stop texting," and McAfee instead "continues to employ vendors it knew had texting subcontractors." [Filing No. 58 at 15.] Ms. Roehrman avers that "the only evidence McAfee presents of vendors being terminated for texting was in response to litigation." [Filing No. 58 at 15.] She states that McAfee cannot rely on disclaimers in its contract that the vendors are independent contractors because "express disclaimers of agency do not necessarily eliminate the existence of an agency relationship" since the "key to finding the existence of an agency relationship is control" even though the "principal

lacks the right to control the full range of the agent's business activities." [Filing No. 58 at 15-17.] Ms. Roehrman notes that McAfee exercises "control over its vendors" through the requirements of "specific approved links, landing pages, promotions, discounts, coupon codes, banner ads, messaging, [] imagery," restrictions on "push notifications," screened sources of traffic, and compliance with McAfee's trademark policy. [Filing No. 58 at 16.]

McAfee replies that "the vendors' subcontractors are not agents." [Filing No. 64 at 10.] McAfee states that "it doesn't control its vendors and certainly not their subcontractors," and states that the "common contractual provisions that describe the services McAfee's vendors will provide" are not "a right of control over the vendors' daily operations." [Filing No. 64 at 10.] McAfee reiterates that "[t]he vendors here, and any subcontractors they independently retained, are each an independent business, separate and apart from McAfee, and they perform marketing work for other companies, not just McAfee." [Filing No. 64 at 11 (quotation omitted).] McAfee argues further that "there is no implied actual authority." [Filing No. 64 at 7.] It argues that an "agent has implied authority for the performance or transaction of anything reasonably necessary to effective execution of his express authority." [Filing No. 64 at 8.] McAfee contends that "[n]o vendor or subcontractor . . . could have interpreted McAfee's express instruction not to send texts to mean they somehow had the implied authority to send texts." [Filing No. 64 at 8.] McAfee states that it did not acquiesce to the texts, but instead "took prompt action to stop the prohibited conduct, including by acting to terminate the responsible parties." [Filing No. 64 at 9-10.] It further states that although Ms. Roehrman "faults McAfee for acting only in response to litigation," "she fails to submit evidence that McAfee knew about the impermissible texts to her any earlier." [Filing No. 64 at 10.] And McAfee argues that although Ms. Roehrman "faults McAfee. . . for not reversing

commissions based on texts to her," she "admits herself that she purchased nothing from McAfee," so there are "no commissions for McAfee to reverse." [Filing No. 64 at 10.]

"In [a] federal question case where federal statutes [such as the TCPA] do not authorize nationwide service of process, a federal court in [Indiana] may exercise personal jurisdiction over [the defendant] if it would be permitted to do so under the [Indiana] long-arm statute." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010) (citing Fed. R. Civ. P. 4(k)(1)(A)). "Indiana's long-arm provision now extends to the limits of the Constitution," so the Court need apply only a federal analysis. *LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 967 (Ind. 2006) (citation omitted). To the extent that the IDCSA claim is brought under supplemental jurisdiction or diversity jurisdiction, Indiana's long-arm provision would again apply, leading the Court back to federal law.

Under federal law, personal jurisdiction can be either "general" or "specific." *uBID, Inc.*, 623 F.3d at 425. In this case, Ms. Roehrman argues that the Court has specific jurisdiction over McAfee. "For specific personal jurisdiction, there must be: (1) purposeful availment— the defendant must have purposefully directed [its] activities at the forum state or purposefully availed [itself] of the privilege of conducting business in the forum; (2) relatedness—the alleged injury must arise out of or relate to the defendant's forum-related activities; and (3) fairness— the exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice." *B.D. ex rel. Myer*, 91 F.4th at 861. For the relatedness requirement, "the defendant's minimum contacts with the forum state" must be "suit-related." *Id.* at 861-62. "[T]he proper focus of the analysis is on defendant's conduct and whether plaintiff's claim arises out of that conduct." *GCIU-Emp. Ret. Fund*, 565 F.3d at 1024. This includes the conduct of a defendant's agents. *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 590 (7th Cir. 2021) (holding that "the attribution of an agent's conduct to a

principal to establish specific personal jurisdiction comports with federal due process") (citing sister-circuit cases in agreement).

The ultimate question to answer is this: "is it fair and reasonable to call the defendant into the state's courts to answer the plaintiff's claim?" *uBID, Inc.*, 623 F.3d at 426.

*1. The Subcontractors' Scope of Authority*

a. Agent-Principal Relationship

Agency is a relationship that arises when one person, the "principal," and another person, the "agent," agree that the "agent shall act on the principal's behalf and subject to the principal's control." Restatement (Third) of Agency § 1.01 (2006). The Seventh Circuit has explained that "[t]he norm of agency is that a principal is liable for the wrongful acts of the agent taken within the scope of the agency—that is, the authority to complete the task as signed by the principal." *United States v. Dish Network L.L.C.*, 954 F.3d 970, 976 (7th Cir. 2020). If a defendant and a contractor have an agency relationship, they are collectively "one 'seller'"; "otherwise any household could receive endless calls peddling [the defendant's] service, as long as each came from a different . . . retailer." *Id.* at 975. "[T]he attribution of an agent's conduct to a principal to establish specific personal jurisdiction comports with federal due process." *Bilek*, 8 F.4th at 590. The "existence of an agency relation is a question of fact reviewed for clear error." *Dish Network L.L.C.*, 954 F.3d at 975.

The current facts do not clearly show an agency relationship. Although McAfee argues that the subcontractors are not agents because they were not employees, "not every agent is an employee. Some are independent contractors." *Jeffords v. BP Prod. N. Am. Inc.*, 963 F.3d 658, 664 (7th Cir. 2020). McAfee notes that the Special Terms and Conditions disavow agency, but "parties cannot . . . negate agency if the relation the contract creates is substantively one of agency." *Dish Network L.L.C.*, 954 F.3d at 975. There is the fact that there are multiple entities for whom

the subcontractors worked, but that, too, is not decisive since they could be agents with multiple principles. Restatement (Third) of Agency § 3.14. And the fact that the subcontractors or their sub-subcontractors are degrees below contractors also is not dispositive because they could be legally binding "subagents" themselves with multiple principals. Restatement (Third) of Agency § 3.15.

In similar cases, courts have dealt with these nuances. *See, e.g.*, *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 924-25 (C.D. Ill. 2017), *aff'd in part, vacated in part on other grounds at* 954 F.3d 970 (7th Cir. 2020) (finding that telecommunications company's agents had authority to appoint subagents for purposes of TCPA violations); *Fed. Trade Comm'n v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 776 (N.D. Ill. 2016) (observing that "[a]n agent can serve multiple principals at once, even principals that are competing with one another") (citation omitted). But the parties have not briefed these subtleties. To avoid the potentially material nuances of subagents, multiple principals, and subagents with multiple principals, the Court assumes without deciding that the subcontractors were binding subagents – though the Court is skeptical. Given this assumption, the Court's analysis focuses on whether those subcontractors acted within their scope of authority since "[o]nly interactions that are within the scope of an agency relationship affect the principal's legal position." Restatement (Third) Of Agency § 1.01; *Bilek*, 8 F.4th at 591 (holding that "a principal is liable for the wrongful acts of an agent acting within its authority").

b. Actual Authority

As the Seventh Circuit has explained, "case law addressing agency in the personal jurisdiction context is limited. *Id.* at 590. Consequently, the Seventh Circuit frequently relies on the Restatement of Agency; indeed "federal common law" accords with the Restatement. *Id.* at 587. So the "basic law of agency . . . is a crucial component in [the Court's] analysis." *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 865 (7th Cir. 1998).

"An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) Of Agency § 2.01. An agent's actual authority may be "express" or "implied." *Moriarty*, 155 F.3d at 866. "Express authority exists when a principal expressly authorizes an agent and the agent acts on the principal's behalf and subject to the principal's control." *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020). Implied authority exists where "the performance or transaction of anything [is] reasonably necessary to effective execution of . . . express authority." *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000). Alternatively, under the Restatement, an agent has implied authority "to act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent." Restatement (Third) of Agency § 2.01 cmt. b. Under either formulation of implied authority, it is "established through circumstantial evidence," regarding the "inherent[]" nature of the task assigned to the agent. *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016). Ultimately, "[t]he focal point for determining whether an agent acted with actual authority is the agent's reasonable understanding at the time the agent takes action." Restatement (Third) Of Agency § 2.01 cmt. c.

The record indicates that a subcontractor could not reasonably believe it had actual authority to send marketing text messages. Because the subcontractors "expressly contradicted" McAfee's "actual instructions, this is clearly not" express actual authority. *Bridgeview Health Care Center, Ltd.*, 816 F.3d at 939. As to implied actual authority, sending texts that violate the law was not "reasonably necessary to effective execution of . . . express authority." *Opp*, 231 F.3d

at 1064. After all, "[t]o engage a contractor is to cause [texts], not necessarily violations" of the law. *Dish Network L.L.C.*, 954 F.3d at 974. Nor could a subcontractor reasonably believe it had implied authority based on McAfee's objectives. Without further indications to the contrary, a reasonable agent should know that "a principal does not intend to authorize" it to violate the law. Restatement (Third) Of Agency § 2.02 cmt. h.

Having granted neither express nor actual authority, to be subject to specific jurisdiction, McAfee would have to have ratified the offending text messages. The Court turns to ratification next.

c. Ratification

McAfee argues that it did not ratify the subcontractors' text messages. [Filing No. 51 at 19.] McAfee avers that "ratification is unavailable where neither actual nor apparent authority exist[s]." [Filing No. 51 at 19.] McAfee states that "ratification requires either a manifestation of assent or acceptance of the benefits of the unauthorized action with full knowledge of the facts and the choice to either accept or reject the benefit of the transaction." [Filing No. 51 at 19 (quotation omitted).] McAfee states that Ms. Roehrman "doesn't show that McAfee received any benefit from the alleged text messages because she does not allege facts showing she bought anything from McAfee based on texts sent to her by any third party." [Filing No. 51 at 20.] Additionally, McAfee states that it did not "manifest[] assent with full knowledge of the facts"; rather, it "expressly and quickly admonished the conduct once it learned the details of the alleged texts," demanding that the subcontractors "immediately stop." [Filing No. 51 at 20.] Finally, McAfee states that its "relevant agreements prohibit text-message marketing and require its vendors and their subcontractors to follow all applicable laws." [Filing No. 51 at 21.]

Ms. Roehrman responds that McAfee is "bound by its vendors' conduct through ratification." [Filing No. 58 at 17.] She states that "[r]atification does not require an agency

relationship as 'ratification may create a relationship of agency when none existed between the actor and the ratifier at the time of the act.'" [Filing No. 58 at 17 (quoting Restatement (Third) of Agency §4.01 cmt. b).] She argues that McAfee "cannot be justified in willfully closing [its] eyes to knowledge," "remain[ing] ignorant," and "refus[ing] to follow leads, where [its] failure to do so can only be explained upon the theory that [it] preferred not to know what an investigation would have disclosed." [Filing No. 58 at 17.] She concedes that she did not "purchase[] a McAfee product after receiving the text messages from McAfee's vendors," but insists that "these vendors were contacted and asked to stop texting" only "after lawsuits were filed, and not after McAfee learned consumers were receiving text messages that allegedly violated McAfee policy." [Filing No. 58 at 17-18.] Ms. Roehrman concludes that "McAfee therefore knowingly accepted leads from vendors it had evidence were sending misleading and deceptive text messages," sufficient to demonstrate ratification. [Filing No. 58 at 17-18.]

McAfee replies that "there is no ratification." [Filing No. 64 at 12.] McAfee states that "[t]o establish ratification, [Ms.] Roehrman must provide some evidence that McAfee knowingly accepted a benefit from the texts," but Ms. Roehrman bought nothing from McAfee at all. [Filing No. 64 at 12.] Even if she had, McAfee argues that where "an actor is not an agent and does not purport to be one, . . . ratification is not a basis on which another person may become subject to the legal consequences of the actor's conduct." [Filing No. 64 at 13 (quoting Restatement (Third) of Agency § 4.03 cmt. b).] McAfee states that there was no agency relationship, and thus no ratification, and in any event, McAfee "took decisive steps . . . to make sure that the offending independent subcontractors were barred from performing further work from McAfee." [Filing No. 64 at 13.]

In general, "ratification retroactively creates the effects of actual authority." Restatement (Third) Of Agency § 4.02(1). "A person ratifies an act by 'manifesting assent that the act shall affect the person's legal relations' or by 'conduct that justifies a reasonable assumption that the [principal] so consents.'" *United States v. Aldridge*, 642 F.3d 537, 541 (7th Cir. 2011) (quoting Restatement (Third) of Agency) § 4.01). Such consent can be shown when a principal "enjoys the benefits of the contract and does not repudiate it" within a reasonable time. *NECA-IBEW Rockford Loc. Union 364 Health & Welfare Fund v. A & A Drug Co.*, 736 F.3d 1054, 1059 (7th Cir. 2013). Such consent also arises when a principal enjoys the benefits of the contract and "had knowledge of facts that would have led a reasonable person to investigate further," and the principal accepted the benefit "without further investigation." Restatement (Third) Of Agency § 4.06 cmt. d; *Alterman v. Lydick*, 241 F.2d 50, 53 (7th Cir. 1957) (finding ratification where the principal was ignorant only because "he preferred not to know what [an] investigation would have disclosed"). "A principal that learns of illegal behavior committed by its agents, chooses to do nothing, and continues to receive the gains, is liable for the agent's acts." *Dish Network L.L.C.*, 954 F.3d at 976. "[T]he state of [a principal's] knowledge is [a] factual question." *Id.* at 978.

There are, however, requirements for ratification, including "that the principal have full knowledge of the facts and the choice to either accept or reject the benefit of the transaction." *NECA-IBEW Rockford Loc. Union 364 Health & Welfare Fund*, 736 F.3d at 1059 (citation omitted). Ms. Roehrman is correct that "[r]atification may create a relationship of agency when none existed before." Restatement (Third) Of Agency § 4.03 cmt. a. It is also true, though, that "[w]hen an actor is not an agent and does not purport to be one, the agency-law doctrine of ratification is not a basis on which another person may become subject to the legal consequences of the actor's conduct." Restatement (Third) Of Agency § 4.03 cmt. b.

On the undisputed facts, McAfee did not ratify any transaction as to Ms. Roehrman. McAfee received no benefits from Ms. Roehrman, who purchased no McAfee product in response to the offending text messages. This necessarily means that McAfee had no knowledge of any benefit siphoned from Ms. Roehrman because there was none. Far from maintaining ostrich-like ignorance, upon learning of the text messages, McAfee promptly took action by directing that the texts stop and that offending subcontractors be terminated. In any event, the text messages did not claim the sender was an agent, which is required for ratification.

In sum, even assuming that the subcontractors were subagents, Ms. Roehrman has not met her burden of showing that they acted within the scope of their authority or that McAfee ratified their actions.

*2. Jurisdictional Discovery*

Ms. Roehrman states that "[i]f this Court deems it necessary to further explore the statements made by parties with material facts in dispute, jurisdictional discovery should be permitted, with a hearing thereafter." [Filing No. 58 at 18.]

The decision to grant jurisdictional discovery, like all discovery matters, is within the Court's "broad discretion," whose review "is deferential and only for abuse of discretion." *Fields v. City of Chicago*, 981 F.3d 534, 550-51 (7th Cir. 2020). In order to justify jurisdictional discovery, "[a]t a minimum, the plaintiff must establish a colorable or prima facie showing of personal jurisdiction . . . ." *GCIU-Emp. Ret. Fund*, 565 F.3d at 1026. The Court has already held that Ms. Roehrman has not met her burden to establish a prima facie showing of personal jurisdiction.

Even if Ms. Roehrman had met her burden, her discovery request gives the Court pause. Ms. Roehrman proposes that jurisdictional discovery would "elicit relevant data, including but not limited to:

> (a) the dates and payments made to violating affiliates;
>
> (b) details regarding the action taken after McAfee discovered former sub-affiliate TCPA violations;
>
> (c) any communications between McAfee . . . and the violating subcontractors;
>
> (d) the content and timing of permissions provided by McAfee to the violating subcontractors for use of McAfee landing pages, promotions, and URLs; and
>
> (e) any re-direction policies or practices McAfee employs with affiliate links, and, for any affiliates who were terminated or no longer work with McAfee, how McAfee's website is still linked to the original texts sent to Plaintiff's Indiana telephone number.

[Filing No. 58 at 18-19.]

Ms. Roehrman's discovery request extends well beyond her personal experience with the offending subcontractors. The Court is mindful that frequently, without jurisdictional discovery, "it is not surprising that [the plaintiff] can do little more than suggest that [the defendant] currently has minimum contacts." *B.D. ex rel. Myer*, 91 F.4th at 864 (citation omitted). But Ms. Roehrman knows the answers to her own questions. She has no date and payment made to violating affiliates because she made no purchase, and McAfee took action to sever ties with the offending subcontractors. Ms. Roehrman bears the burden to establish specific jurisdiction arising from harms to her, not to other hypothetically harmed people. "[A] district court does not abuse its discretion in denying additional discovery where the request was based on nothing more than mere speculation and would amount to a fishing expedition. Nor is a plaintiff entitled to discovery to establish essentially speculative allegations necessary to personal jurisdiction." *In re Sheehan*, 48 F.4th 513, 527 (7th Cir. 2022) (citation omitted).

The Court is also mindful that "[i]f material facts about personal jurisdiction are in dispute," the court "must hold an evidentiary hearing to resolve them." *Hyatt Int'l Corp. v. Coco*, 302 F.3d

707, 713 (7th Cir. 2002). But the most important material fact is undisputed: in response to the text messages, Ms. Roehrman purchased nothing from McAfee at all.

Because Ms. Roehrman has not shown that the subcontractors, to the extent they were McAfee's agents, acted within the scope of their agency or that McAfee ratified their actions, McAfee's Motion to Dismiss is **GRANTED IN PART** to the extent it is based on a lack of personal jurisdiction.[2] Additionally, Ms. Roehrman's request for jurisdictional discovery is **DENIED**.

## II.
## REMAINING MOTIONS

The portion of McAfee's Motion to Dismiss which requests dismissal of certain counts of the Amended Complaint for failure to state a claim, [Filing No. 51 at 16-18], and McAfee's Motion to Strike, [Filing No. 65], are **DENIED** as moot.

## III.
## CONCLUSION

Fundamentally, this case concerns whether a party should expect to be hailed into a jurisdiction for the prohibited acts of a contractor of a contractor — or perhaps even a contractor of a contractor of a contractor — who did not entice a single purchase from the plaintiff. The answer is no. Ms. Roehrman has not met her burden to establish a prima facie case of specific personal jurisdiction and the Court now rules as follows:

[2] The Court is skeptical that it even has subject-matter jurisdiction since Ms. Roehrman, having made no purchase of McAfee software and having suffered no actual damages, arguably has no standing. But because the parties have argued personal jurisdiction, the Court dismisses on that basis. *Ruhrgas AG v. Marathon Oil Co.*, 119 S. Ct. 1563, 1567 (1999) (holding that "[c]ustomarily, a federal court first resolves doubts about its jurisdiction over the subject matter, but there are circumstances in which a district court appropriately accords priority to a personal jurisdiction inquiry").

- McAfee's Motion to Dismiss, [49], is **GRANTED IN PART** to the extent it is based on a lack of personal jurisdiction;
- Ms. Roehrman's request for jurisdictional discovery is **DENIED**;
- McAfee's Motion to Dismiss, [49], is **DENIED IN PART AS MOOT** to the extent it is based on failure to state a claim upon which relief can be granted; and
- McAfee's Motion to Strike, [65], is **DENIED AS MOOT**.

Final Judgment shall issue accordingly.

Date: 12/6/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Stacy M. Bardo
Bardo Law, P.C.
stacy@bardolawpc.com

David Meadows
Watstein Terepka LLP
dmeadows@wtlaw.com

John Thomas Steinkamp
JOHN STEINKAMP & ASSOCIATES
John@johnsteinkampandassociates.com

Ryan D. Watstein
Watstein Terepka LLP
ryan@wtlaw.com

Amy L. Wells
Wells Law Office, Inc.
amywells@equaljusticelaw.com

Benjamin Williams
Watstein Terepka LLP
bwilliams@wtlaw.com